1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * *

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )        2:11-cr-00188-RLH-CWH
                                )
vs.                             )        **ORDER AND REPORT AND**
                                )        **RECOMMENDATION OF UNITED STATES**
ANTOUN JEAN FATA and            )        **MAGISTRATE JUDGE**
ADMA FATA,                      )
                                )
        Defendants.             )
_____ )

This matter was referred to the undersigned Magistrate Judge on Defendant Adma Fata's Motion to Suppress (#39), filed October 14, 2011; Defendant Antoun Jean Fata's Motion to Suppress (#41), filed October 19, 2011; the Government's Response to Adma Fata's Motion to Suppress (#43), filed October 25, 2011; and the Government's Response to Defendant Antoun Jean Fata's Motion to Suppress (#44), filed October 27, 2011. The Court conducted an evidentiary hearing on November 4, 2011. At the hearing, defense counsel for Antoun Fata reported that she had learned that agents from the Federal Bureau of Alcohol, Tobacco and Firearms ("ATF") had placed a Global Positioning System ("GPS") tracking device on Defendant's vehicle during the course of the investigation. Because counsel did not know of the GPS tracking device prior to filing the motion to suppress, she requested the opportunity to file a supplemental briefing. That request was granted and, on November 29, 2011, Defendant Antoun Jean Fata filed his Supplemental Motion to Suppress (#55). Defendant Adma Fata filed a Motion for Joinder (#56) on November 30, 2011. The Government filed its Supplemental Response (#61) on December 16, 2011. Based on the representations made in the parties' supplemental briefing, the Court determined to reopen the evidentiary hearing. Additional testimony was presented on December 29, 2011, and on January 11, 2012.

On January 23, 2012, the United States Supreme Court issued its decision in *United States v. Jones*, 132 S. Ct. 945 (2012), a case implicating the Fourth Amendment as it relates to the warrantless use of GPS devices. After the Supreme Court issued its ruling in *Jones*, the Court held a status conference wherein the parties agreed to modify the briefing schedule. As a result of the modification, the Government's supplemental briefing was provided on February 3, 2012 (#82), and Defendants' response provided on February 10, 2012 (#85).

## BACKGROUND

On May 16, 2011, the federal Grand Jury returned an Indictment against Defendant Antoun Fata charging him with one count of Illegal Acquisition of a Firearm in violation of 18 U.S.C. § 922(a)(6) and 924(a)(2) and one count of Purchase of a Firearm Outside State of Residence in violation of 18 U.S.C. § 922(a)(3) and 924(a)(1). On August 2, 2011, the federal Grand Jury returned a Superseding Indictment charging the Defendant Antoun Fata with eight counts of Illegal Acquisition of a Firearm in violation of 18 U.S.C. § 922(a)(6) and 924(a)(2), one count of Illegal Transport or Receipt of Firearm Acquired Outside State of Residence in violation of 18 U.S.C. § 922(a)(3) and 924(a)(1), and of Aiding and Abetting in violation of 18 U.S.C. § 2. The Superseding Indictment also charged Defendant Adma Fata with seven (7) counts of Illegal Acquisition of a Firearm in violation of 18 U.S.C. § 922(a)(6) and 924(a)(2)and Aiding and Abetting in violation of 18 U.S.C. § 2.

On or about April 18, 2011, ATF agents opened an investigation into multiple purchases of weapons in Nevada by the Defendants. In conjunction with the purchase of 22 pistols on July 10, 2010, February 10, 2010, and April 6, 2011, ATF agents learned that Defendants, husband and wife, were purchasing firearms using Defendant Antoun Fata's correct name but a false address in Las Vegas, Nevada despite being residents of California. It is alleged that Defendant Adma Fata assisted her husband in completing the purchase forms because he is visually impaired. Based upon the information obtained during its investigation, ATF agents requested notification from the Nevada Department of Public Safety whenever Defendants attempted to purchase a firearm from a Federal Firearms Licensee (FFL) in Nevada. This "flagging" process requires the immediate notification of ATF as to any ongoing firearms purchase in order

to allow ATF agents to respond to the purchase location.

As part of its ongoing investigation, ATF agents Michael LaRusso ("LaRusso") and Eric Fox ("Fox") traveled from Las Vegas to Riverside, California on or about April 29, 2011 and placed a GPS tracking device on Defendants' vehicle.  The small, handheld device is attached by magnet to the underside of the vehicle.  The device provides remote, instantaneous date-time information regarding the location of the vehicle, its speed when moving, and the period of time the vehicle is parked.  The data is compiled onto a third-party website and is available to ATF agents.  As part of the web-based location monitoring system, Agent LaRusso arranged to be notified by email whenever Defendants' vehicle moved outside of the Riverside area and whenever it approached the Las Vegas area.  Additionally, the device itself contains a hard drive which, once recovered, allows the stored data to be downloaded onto a computer.  Agents were also able to "ping" or access the device at anytime to determine the exact location of Defendants vehicle.

The GPS device was placed without a warrant on Defendants' vehicle between 4:00 AM and 5:00 AM on April 29, 2011.  At the time the GPS device was placed, the vehicle was parked in the driveway at Defendants' residence in Riverside, California.  The driveway was accessible to the public and leads from a public street to a garage.  The vehicle was not in the garage when the GPS device was attached.  The ATF agents who placed the device testified that there were no "no trespassing" signs on the property when they placed the GPS device.  Nor were there any fences or gates which would restrict access to the driveway.  There were no features which would prevent someone standing in the street from seeing the entire driveway or the vehicle.  The GPS device was attached to the vehicle located in Defendant's driveway, and there were no special features of Defendants' driveway (i.e., enclosures, barriers, lack of visibility from the street) preventing public access to the driveway area.

On May 14, 2011, ATF Agent LaRusso received an alert from the GPS device that Defendants' vehicle was traveling towards Las Vegas.  Consequently, ATF agents organized surveillance operations and confirmed Defendants' presence in Las Vegas at a local hotel.  On May 15, 2011, the ATF agents observed Defendants purchase firearms at two locations:  The Gun Store and a gun show at a local convention center in Las Vegas.  ATF agents obtained surveillance video from The Gun Store which purports to depict the

3

purchases made by Defendants.

At approximately 3:00 PM on May 15, after completing their firearms purchases, Defendants drove onto Interstate 15, presumably to return to their California home. With support from Las Vegas Metropolitan Department ("Metro") officers, ATF agents followed Defendants. At one point, law enforcement lost visual contact with Defendants' vehicle. To regain visual contact and continue their pursuit, law enforcement accessed real-time data from the GPS device attached to Defendant's vehicle. As a result, law enforcement located the vehicle as it was heading south on I-15 toward southern California. About 25 miles south of Las Vegas, at 3:28 PM, near the exit for Jean, Nevada, the Metro officers who were following Defendants observed the vehicle speeding and initiated a traffic stop. Except to argue that it was the fruit of an unconstitutional use of the GPS device, Defendants do not otherwise contest the lawfulness of the traffic stop.

Defendants were requested to exit their vehicle by the Metro officers conducting the stop. Shortly thereafter, ATF Agent LaRusso arrived and saw both Defendants standing on the roadside outside of their vehicle. The Metro officer advised Agent LaRusso that he had a brief conversation with Mrs. Fata, who was the driver of the vehicle. He reported that Mrs. Fata informed him that she was from California, had visited Las Vegas for the day, and that there were firearms in the trunk of the vehicle. Agent LaRusso then approached Mr. Fata and asked him several questions. In response to Agent LaRusso's questions, Mr. Fata indicated that he was from California, that he was in Las Vegas to purchase firearms, that he was taking the firearms that he had purchased to California and then to Lebanon, and that he had done this on previous occasions. After this discussion, which reportedly took only a few minutes, Agent LaRusso arrested Mr. Fata. Upon arrest, Mr. Fata was handcuffed and read his *Miranda* rights.

Thereafter, Mrs. Fata consented to the search of the vehicle. The voluntariness of the consent to search the vehicle is not disputed. The vehicle search took approximately 20-25 minutes. During the search, law enforcement found and seized multiple firearms. Agent LaRusso testified that, after the firearms were seized, he told Mrs. Fata that she was not going to be placed under arrest. Mrs. Fata was informed that, if she wanted, she could follow the agents to the ATF Field Office where they planned to transport her

husband.  Mrs. Fata testified that Agent LaRusso had taken her identification card, proof of insurance, and cell phone so she did not believe she had any other choice except to follow the agents to the ATF office. Agent LaRusso testified that the total stop took about 30 minutes.

After the stop, Mr. Fata was transported back to the Las Vegas ATF Field Office.  Records indicate that Mr. Fata was transported at about 4:00 PM and arrived at the ATF Field Office by 4:21 PM.  Mrs. Fata drove herself to the office and, when she arrived, ATF agents instructed her where to park.  Once at the office, Agent LaRusso again advised Mr. Fata of his *Miranda* rights and then interviewed him.  The interview lasted for approximately one hour.  During the interview, Defendant further elaborated on the details of the roadside statements and the firearms purchases.

Coinciding with Mr. Fata's interrogation, Mrs. Fata testified that as she entered the office ATF Agent Tyler Olson ("Olson") took her car keys.  Agent Olson disputes this testimony.  Mrs. Fata was then directed to a waiting room.  After a few minutes, Mrs. Fata requested to use the restroom.  Because the restroom was locked, ATF agents escorted her to the restroom.  A female agent waited outside the door and then escorted Mrs. Fata back to the waiting room.  After about fifteen minutes, Mrs. Fata was taken to an unsecured conference room where she was questioned  regarding the firearm purchases.  She was not given *Miranda* warnings prior to the questioning.  She was placed in a conference room that has no recording capabilities because it is not typically used for custodial interrogations.  Once in the room, Mrs. Fata testified that she was seated at a large conference table with one agent seated in front of her and one agent seated to her side. Mrs. Fata was sitting directly beside one door and across the room from another door.  Both Agent LaRusso and Agent Olson testified that the conference room was unsecured.

At the conclusion of the questioning, agents escorted Mrs. Fata to Mr. Fata's interrogation room and obtained her consent to search the Fata's residence.  In total, Mrs. Fata remained at the ATF field office for about four hours.  She was allowed to leave the office without any restrictions or obligation to return.  She was escorted to her car by an unidentified female ATF employee, who asked for and obtained Defendant's gun registration.

Now, Defendant Antoun Fata seeks an order suppressing all of his statements and other evidence

obtained on May 15, 2011 as the illegal "fruit" of the unlawful use of the GPS device.  He alleges that the GPS device was illegally installed on his vehicle without a warrant.  He also claims that his roadside statements must be suppressed because law enforcement failed to apprise him of his *Miranda* rights.  He further seeks to suppress all of his statements made at the ATF Field office because they were the product of the unwarned roadside statements.  Specifically, Mr. Fata claims that law enforcement used an improper two-step interrogation technique in which they first obtained his confession without providing *Miranda* warnings and then later provided the *Miranda* warnings and obtained a second confession.  Finally, Mr. Fata seeks to suppress the firearms seized from the trunk of the vehicle, the weapons seized from Defendants' home, and all other evidence seized from Defendants' home.  Accordingly to Mr. Fata, all of the evidence derives from the illegal use of the GPS device.

Defendant Adma Fata seeks to suppress all statements and observations made on May 15, 2011, claiming  they were obtained as a result  of the use of the illegal installation of the GPS device on the vehicle.  The evidence she seeks to suppress includes the roadside statements, the evidence seized from the trunk of her vehicle, and the  weapons and other evidence seized from Defendants' home.  She does not challenge the voluntariness of her consent to search the vehicle or her home.  She does argue that the statements made at the ATF field office must be suppressed because law enforcement failed to apprise her of her *Miranda* rights.

The Government argues: (1) that the placement of the GPS should not result in the suppression of the evidence; (2) that Mr. Fata  was not "in custody" during the traffic stop and, therefore, not entitled to the *Miranda* warnings until he was formally arrested; (3) that Mrs. Fata was not in custody during the traffic stop or while present at the ATF Field Office and, therefore,  she was not entitled to *Miranda* warnings at any point during the encounter.

## DISCUSSION

### 1.  ATF's use of the GPS locating device violated Defendants' Fourth Amendment rights

The lynchpin of this case is whether the warrantless placement of the GPS device by ATF agents on Defendants' vehicle violated the Fourth Amendment.  During the pendency of this case, the Supreme Court

issued its ruling in *United States v. Jones*, 132 S. Ct. 945 (2012).  The Supreme Court held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a search" within the meaning of the Fourth Amendment.  *Jones*, 132 S. Ct. at 949.  Based on *Jones*, this Court finds that the warrantless installation of the GPS device on April 29, 2011 by ATF agents violated Defendants' Fourth Amendment rights.  The device was used to gather information alerting ATF personnel of Defendants' travel in the vehicle to Las Vegas on May 14, 2011.  It was used to locate Defendants after law enforcement lost visual contact with the vehicle as Defendants traveled along Interstate 15 toward California on May 15, 2011.  It was therefore used in a manner that violated the Fourth Amendment.  Nevertheless, the mere fact that there has been a constitutional violation does not always compel suppression of evidence obtained as a result of the violation.

**2.  Application of Jones – The Good Faith Exception**

The violation of a constitutional right does not automatically trigger the exclusionary rule.  The Supreme Court has held that the exclusionary rule "is a 'prudential' doctrine[] created by this Court to 'compel respect for the constitutional guaranty.'" *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (citing *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 363 (1998) and *Elkins v. United States*, 364 U.S. 206, 217 (1960)).  The sole purpose of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis*, 131 S. Ct. at 2426 (citations omitted).  The Supreme Court has "limited the [exclusionary] rule's operation to situations in which this purpose is 'thought most efficaciously served.'" *Id*. (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974)).  "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 131 S. Ct. at 2427 (citation omitted).

In *Davis*, the Supreme Court addressed whether the exclusionary rule should apply when law enforcement act in objectively reasonable reliance on binding judicial precedent that is overruled after the objectively reasonable act.  The facts of *Davis* are, generally, analogous with the present case.  In *Davis*, the defendant was convicted of being a felon in possession of a weapon.  In compliance with existing Eleventh Circuit precedent, the weapon was seized during a vehicle search conducted incident to Davis' arrest and

after he had been secured in a police vehicle. While Davis' appeal was pending, the Supreme Court issued its decision in *Arizona v. Gant*, 556 U.S. 332 (2009). In light of *Gant*, the search of Davis made incident to his arrest violated his Fourth Amendment rights. However, the Supreme Court, applying its "good faith" line of cases that began with *United States v. Leon*, 468 U.S. 897 (1980), held that the "harsh sanction of exclusion should not be applied to deter objectively reasonable law enforcement activity." *Davis*, 131 S.Ct. 2429. Specifically, the Court held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id*. The only deterrent of excluding evidence obtained in instances where officers conduct themselves in conformity with binding appellate precedent, even if later found to be unconstitutional, is "to discourage the officer from doing his duty." *Id*. (citations omitted).

Here, ATF agents placed a GPS device on Defendants' vehicle and used it in a manner nearly indistinguishable from the facts in *United States v. Pineda-Moreno*, 591 F.3d 1212 (9th Cir. 2010). In *Pineda-Moreno*, the Ninth Circuit held that the placement of a GPS device in a private driveway, and subsequent monitoring of the device, did not violate the Fourth Amendment. The device in this case was of similar size and technological capability as in *Pineda-Moreno*. It was similarly installed in the early morning hours on a vehicle parked in a private driveway adjacent to Defendants' home. There were no fences, no gates, no "no trespassing" signs, and no other impediments or indicators that the property could not be entered. Like *Pineda-Moreno*, the device alerted law enforcement of Defendants' location which, ultimately, lead to Mr. Fata's arrest and the subsequent charges.

Defendants attempt to bypass *Pineda-Moreno* by arguing that the ATF agents failed to follow internal ATF Regulations in the placement of the GPS device. For example, Defendants argue that ATF regulations advise ATF agents to discuss with ATF counsel or an assistant United States Attorney whether a warrant is necessary prior to the installation of a GPS tracking device. Even assuming that internal ATF Regulations required additional administrative reporting, oversight by ATF supervisors, and consultation with the Assistant United States Attorney, Defendants identify no constitutional provision or statute which requires compliance with ATF regulations. Compliance with these internal agency regulations is not

"mandated by the Constitution or federal law," and, therefore, it is not the province of this court to penalize the government for non-compliance. *See United States v. Caceres*, 440 U.S. 741, 749 (1979) (tape recording admissible even though procured in violation of "mandatory" IRS procedures); *United States v. Hinton*, 222 F.3d 664, 674-75 (9th Cir. 2000) (package contents admissible even though postal service procedures not followed).

Consequently, even assuming non-compliance with ATF regulations, the Court finds that use of the GPS device in this case was lawful under *Pineda-Moreno* at the time it was installed and monitored. Further, consistent with the Supreme Court's decision in *Davis v. United States*, 131 S. Ct. 2419 (2011), the Court finds that the purpose of the exclusionary rule would not be served in this instance by suppression based solely on placement of the GPS device because placement of the GPS device and the subsequent monitoring was done in reasonable reliance on then binding appellate precedent as announced in *Pineda-Moreno*.

As a result of the Court's finding and the decision in *Davis*, even though the installation and use of the GPS device to assist agents in initiating their surveillance on May 14, 2011 through May 15, 2011 did violate Defendants' Fourth Amendment rights, none of the information obtained as a result thereof is subject to suppression. In particular, the surveillance evidence obtained by agents on May 15, 2011, when they observed and overheard conversations during the purchases of firearms at the Gun Store and the gun show will not be suppressed.[1]

**3. The Roadside Events**

On May 15, 2011, at about 3:00 p.m., shortly after completing the purchase of firearms, Defendants began their return trip to California on Interstate 15. Metro officers, in conjunction with ATF agents, followed Defendants' vehicle, and during this time, temporarily lost visual contact with Defendants' vehicle. In order to reestablish contact, ATF agents used the GPS device to locate Defendants' vehicle and found them as they were heading southbound on Interstate 15 toward California.

---

[1] ATF agents also obtained surveillance videos from the Gun Store which apparently shows the purchase transactions there, and these videos are not the object of the present suppression motion.

At some point after reestablishing visual contact with Defendants' vehicle, Metro officers observed the vehicle speeding, apparently traveling 78 in a 70 mile per hour zone. As a result of the traffic infraction, Metro officers working with ATF officers initiated a traffic stop. Defendants do not argue that the traffic stop was not based upon probable cause and, accordingly, the Court finds that the initial traffic stop was reasonable. *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

Once the stop was made, both Defendants made incriminating statements and, ultimately, Mr. Fata was arrested and transported to the Las Vegas ATF Field Office. At the Field Office, Mr. Fata made additional incriminating statements. During the stop, Mrs. Fata gave verbal consent to search the vehicle. Multiple firearms were seized as a result of the search. Defendants move to suppress all of the roadside statements, all of the statements made at the ATF Field Office, the weapons seized from the vehicle, and all evidence seized as a result of a subsequent search of Defendants' home.

**A. The Fourth Amendment – The Initial Stop**

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated." U.S. CONST. AMEND. IV. It is well settled that a vehicle stop by the police is a seizure within the meaning of the Fourth Amendment, *United States v. Garcia*, 205 F.3d 1182, 1186 (9th Cir. 2000) (*citing Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), and is subject to the constitutional requirement that it be reasonable. *Prouse*, 440 U.S. at 653-54. The decision to stop a vehicle is reasonable when there is probable cause to believe a traffic violation occurred. *Whren*, 517 U.S. at 810. The constitutionality of a traffic stop does not depend on the subjective motivation or intent of the officer. *Whren*, 517 U.S. at 806. That a traffic violation may serve as a pretext for a stop is irrelevant so long as there are objective circumstances to justify the stop. *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005).

Here, Defendants' vehicle was stopped because it was speeding, apparently traveling 78 in a 70 mile per hour zone. Defendants made no argument that the traffic stop was not based upon probable cause to believe a traffic violation had occurred. Although the use of the GPS did violate Defendants' Fourth

10

Amendment rights, *see supra*, evidence obtained as a result of that violation is not subject to the exclusionary rule because the ATF agents were acting in reasonable reliance on then binding appellate precedent. Accordingly, the court finds that the initial traffic stop was reasonable.

### B. Miranda

The obligation to administer *Miranda* warnings attaches once a person is subject to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). Custody turns on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citing *United States v. Crawford,* 372 F.3d 1048, 1059 (9th Cir. 2004)).

In addition to being in custody, the accused must also be subject to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Not every question asked in a custodial setting constitutes interrogation. *United States v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) (citing *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982)). Interrogation means questioning or "its functional equivalent," including "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. 291 at 301.

The Court finds that the roadside questions asked of both Defendants were likely to elicit incriminating information. In addition to speeding, the Defendants were being investigated for multiple firearms purchases made in Nevada. Questions to Mr. Fata about where he was from, why he was in Las Vegas, what he did with the weapons he had purchased, and whether he had previously purchased weapons were clearly questions designed to elicit incriminating information. The question of whether Defendants were "in custody" during the roadside questioning is less clear.

Prior to addressing the "custody" question, the Court notes that Mrs. Fata's original motion to suppress (#39) did not include a request to suppress her statements or the evidence seized from the trunk of the vehicle during the roadside stop at roadside. She expanded her motion (#87) in light of the decision in *United States v. Jones* to request that her roadside statements and the evidence seized from the trunk of the

vehicle pursuant to her consent as being "fruit" of the illegally placed GPS device.[2]  Under *Davis* (*see supra*), however, the illegal use of the GPS device does not compel exclusion in this case.  Mrs. Fata has not provided any argument, other than the use of the GPS device, as to why her roadside statements or the items seized during the vehicle search should be suppressed.  She does not contest the voluntariness of her consent.  Accordingly, the Court finds that neither Mrs. Fata's roadside statements nor the weapons seized pursuant to the consensual search of the vehicle should be suppressed.

### I. Whether Defendant Antoun Fata was "in custody" during the stop.

Defendant Antoun Fata  argues that he was in custody when  he was required to exit the vehicle on the side of the road and, therefore, should have been given *Miranda* warnings before being questioned by Agent LaRusso.   This is especially true, he contends, given his impaired vision.   The Government argues that this was a valid *Terry* stop, and that Mr. Fata  was not in custody just because he was required to exit the vehicle and respond to Agent LaRusso's questions.

In *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984)*,* the Supreme Court considered "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered custodial interrogation." 468 U.S. at 435.  The Supreme Court held that "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Id*. at 440.   The Court explained that "[t]ypically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id*. at 439.  *See also Arizona v. Johnson*, 555 U.S. 323, (2009) ("[W]e hold that, in a traffic-stop setting, the first *Terry* condition-a lawful investigatory stop-is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe

---

[2]  Defendants were not made aware of the use of the placement or use of the GPS device at the time of the stop.  Defendants were, therefore, not confronted with evidence that had been illegally obtained and there is no connection between the statements and the illegal GPS search.  *See United States v. Crawford*, 372 F.3d 1048, 1058 (9th Cir. 2004) (holding that the "necessary connection" between the illegal search at issue and the defendant's later confession was missing in part because the search produced no evidence whatsoever); *see also United States v. Shetler*, 665 F.3d 1150 (9th Cir. 2011) (confronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent).

1  any occupant of the vehicle is involved in criminal activity.").

2      Removing the driver and its occupant from the vehicle does not amount to custody.  Traffic stops

3  are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983).

4  "Once a motor vehicle has been lawfully detained for a traffic violation, the police may order the driver to

5  get out of the vehicle without violating the Fourth Amendment," *Pennsylvania v. Mimms*, 434 U.S. 106, 111

6  n. 6 (1977) (*per curiam*). The government's "legitimate and weighty" interest in officer safety outweighs the

7  "*de minimis*" additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle.  *Id.* at

8  110–11.  Officers conducting a traffic stop may "take such steps as [are] reasonably necessary to protect their

9  personal safety." *United States v. Hensley*, 499 U.S. 221, 235 (1985).  In *Maryland v. Wilson*, 519 U.S. 408

10  (199), the *Mimms* rule was extended to apply to passengers as well as drivers.  Accordingly, when Mr. Fata

11  was asked to step out of the vehicle after the vehicle was stopped, he was not in custody.  Such a minor

12  intrusion is outweighed by the interest in officer safety.

13

14      Moreover, Defendants were under investigation for crimes involving weapons and, based upon their

15  observations that day, the officers had reasonable suspicion to believe there were weapons in the vehicle.

16  This was confirmed by Mrs. Fata during the stop.  There is no evidence to suggest that a person who is

17  visually impaired, as is Mr. Fata, cannot operate a weapon.  Finally, once removed from the vehicle, Agent

18  LaRusso testified that Mr. Fata was accompanied by a law enforcement officer and, therefore, safe from

19  roadside hazards.  In light of the foregoing, the Court finds Mr. Fata's was not in custody for purposes of

20  *Miranda* when he was removed from the vehicle and asked questions.

21              **II.  Duration of the Traffic Stop**

22       A traffic stop must be of limited duration and may not last "any longer than necessary to process the

23  traffic violation unless there is articulable suspicion of other illegal activity." *United States v. Purcell*, 236

24  F.3d 1274, 1277 (11th Cir. 2001).  *Terry* expressly allows officers, when conducting *Terry* stops, to ask

25  questions "reasonably related in scope to the justification for their initiation." *See United States v.*

26  *Cervantes–Flores*, 421 F.3d 825, 830 (9th Cir. 2005).  An officer may follow up on answers to questions

27  or information he otherwise gleans during the traffic stop in order to investigate suspected criminal activity,

28

13

1   and in doing so, does not impermissibly extend either the duration or the scope of the stop. *See, e.g.*, *United*

2   *States v. Mayo*, 394 F.3d 1271, 1276 (9th Cir. 2005) (holding that the period of detention can be permissibly

3   extended if new grounds for suspicion of criminal activity continue to unfold).

4   Here, when Agent LaRusso arrived at the scene, Mr. Fata  had already been removed from the car.

5   He was not in handcuffs and none of the law enforcement personnel present had their weapons drawn.

6   Agent LaRusso was advised by the Metro officer who initiated the traffic stop that Mrs. Fata had indicated

7   (1) that there were firearms in the vehicle and (2) that she was driving with her husband to California.

8   Because Agent LaRusso's prior surveillance efforts indicated that Defendants had purchased weapons that

9   day, he could reasonably believe that Defendants were  in the process of transporting the weapons purchased

10  in Nevada to California.  His questions to Mr. Fata confirmed this information.  After confirmation, he

11  placed Defendant under arrest.  The entire roadside stop took only about 30 minutes, and Mr. Fata  was

12  arrested before the consensual search of the vehicle, which reportedly lasted 20-25 minutes.  Thus, the Court

13  finds that Mr. Fata  was arrested within the first 10 minutes of the traffic stop, a period of time not so

14  prolonged as to render it custodial as to the Defendant.  *See United States v. Sharpe*, 470 U.S. 675, 685

15  (1985) (no "hard-and-fast" time limit for a permissible *Terry* stop, and a 20-minute investigatory detention

16  was reasonable); *see also Mayo*, *supra*, 394 F.3d at 1275-76 (holding that a detention of between 20 and 40

17  minutes was not impermissibly long in duration).

18

19  Mr. Fata also argues that because Agent LaRusso had probable cause to immediately arrest

20  Defendant when he first contacted him at the traffic stop, he was not free to leave the scene.  Essentially,

21  Mr. Fata argues that he was in custody  and should have immediately been advised of his *Miranda* rights

22  at the time of the stop.  It is true that the ATF investigation, which had been on-going for at least a month,

23  revealed that Defendants had purchased numerous firearms using what appears to be a false Nevada address.

24  The May 15, 2011 ATF surveillance confirmed precisely the same activity.   However, Agent LaRusso

25  testified that he had not yet determined to arrest Mr. Fata when he approached him on the roadside because

26  he first wanted to confirm that Defendant lived in California.

27  An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or

28

14

deed, to the individual being questioned. *Cf. Michigan v. Chesternut*, 486 U.S. 567, 575, n. 7 (1988) (citing *United States v. Mendenhall*, 446 U.S. 544, 554, n. 6 (1980). Those beliefs are relevant only to the extent that they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "freedom of action." *Berkemer*, 468 U.S. at 440; *see also United States v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) (the subjective intent of the police, though relevant, is not determinative because the focus is on the defendant's perceptions). Here, there is nothing to suggest that Agent LaRusso advised Mr. Fata that evidence had been obtained against him or that he intended to arrest Mr. Fata at the time of the stop. Agent LaRusso's beliefs were entirely unknown to Mr. Fata and did not make it anymore likely that Defendant objectively believed he was "in custody" during the roadside discussion. Consequently, the Court finds that Mr. Fata was not "in custody" when he made his roadside statements and, therefore, was not entitled to the *Miranda* warnings.

Finally, the Court rejects the request to suppress the physical evidence obtained during the roadside search of Defendants' vehicle. It is uncontested that Mrs. Fata consented to the search of the vehicle. There has been no evidence presented challenging the voluntariness of the consent. She was not in custody when she gave consent. None of the officers had their weapons drawn. There is no evidence of any threats toward Mrs. Fata. There was nothing presented suggesting that she did not have authority to provide consent to search the vehicle. *See United States v. Matlock*, 415 U.S. 164 (1974) (consensual search is reasonable when the consent-giver has authority over the area searched). Based on the totality of the circumstances and evidence presented, the Court finds that the consent was valid. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973) (consent cannot be coerced by explicit or implicit means or else the resulting "consent" is no more than a pretext for unjustified police intrusion); *see also United States v. Patayan-Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (identifying the five factors courts in the Ninth Circuit use to determine the voluntariness of consent to search and reiterating that "[n]o one factor is determinative in the equation") (citation omitted).

**C. Whether Defendant Adma Fata was "in custody" at the ATF Field Office.**

Defendant Adma Fata argues that she was in custody when she arrived at the ATF Field Office and,

therefore, was entitled to the *Miranda* warnings prior to giving any statements or interview.  Because she was not given the *Miranda* warning, she argues that her statements at the ATF Field Office should be suppressed.    Importantly, the custody determination is objective and is not based upon "the subjective views of the officers or the individual being questioned." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002).  An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is "in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994).

The inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned. *Id*. at 323.  The court must determine whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987), modified by 830 F.2d 127 (9th Cir. 1987); *see also United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).  The following factors are among those likely to be relevant to deciding that question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Hayden*, 260 F.3d at 1066 (citing *Beraun-Panez*, 812 F.2d at 580).  Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators; the factors set forth in *Beraun-Panez* and *Hayden* are simply representative of ones that frequently recur.  *See Kim*, 292 F.3d at 973-974.

### I.  Language used to summons Mrs. Fata to ATF Field Office

Agent LaRusso testified that he told Mrs. Fata she had the option of following the ATF agent to the Field Office.  Mrs. Fata was unable to recall the exact conversation, but initially testified that they (the ATF agents) "asked me, they told me to follow them to the ATF office."  She later clarified her testimony and said that "they told me to follow them."  The Court finds Agent LaRusso's testimony on this point more

credible than Mrs. Fata.  Mrs. Fata's credibility was seriously undermined when, in preparation for the suppression hearing, she signed an affidavit indicating that she had not consented to the search of her home. She later changed that testimony when she learned that the consent had been recorded.  Moreover, there is nothing in the language offered by Mrs. Fata that suggests that she did not have the option of not following the ATF personnel.  It appears to the Court that she went to the ATF office, not because she was the specific target of the investigation, but because she wanted to be there to support and retrieve her husband after his interview was complete.

Mrs. Fata also argues that she was forced to go to the office because (1) ATF agents did not return her identification, proof of insurance, and cell phone after the stop and (2) she was required to accompany her visually impaired husband at all times.  Mrs. Fata did not testify that she would not have traveled to the ATF office if law enforcement had not retained her personal belongings and identification.  Nor did she testify that she requested the immediate return of these items.  Mrs. Fata testified that Mr. Fata travels to Lebanon without her assistance, which demonstrates that Mr. Fata does not exclusively rely on Mrs. Fata's aid to travel.  Additionally, there is no dispute that Mr. Fata was in the custody of ATF agents during his transportation to the field office.  Thus, he quite clearly did not need the aid of Mrs. Fata to travel to the field office.  It is reasonable that Mrs. Fata felt a moral obligation to follow her husband to the ATF field office, but the Court finds there is nothing that supports the conclusion that an obligation was imposed, either expressly or implicitly, by ATF personnel.  Moreover, there is no evidence that she would not have traveled to the ATF office if she had known that she would be interviewed.  Based on the record, the Court finds that Mrs. Fata voluntarily appeared at the ATF field office.

## II. The extent to which Mrs. Fata was confronted with evidence of guilt

Agent Olson testified that Mrs. Fata, during her interview at the ATF Field Office, was questioned about her residency, her role in the purchase of firearms, and whether she traveled to Lebanon.  The interview was not recorded.  There is no evidence that agents confronted Mrs. Fata with any evidence of potential guilt during the interview.  Agents simply asked questions of Mrs. Fata in order to gain further information related to the investigation.  Agent Olson did instruct Mrs. Fata to be cooperative, however,

there is no evidence to suggest that Olson implied that adverse consequences would occur if she did not cooperate. Thus, this instruction was not confrontational. *See United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005) (defendant not in custody when the officers "did not attempt to challenge [the defendant's] statements with other 'known facts' suggesting his guilt, they merely asked [him] about the allegations.").

### III.  The physical surroundings of the interview

The mere fact that the questioning occurred at a law enforcement office is not conclusive on the issue of whether a defendant was "in custody." *See California v. Beheler*, 463 U.S. 1121, 1125 (1982) (*per curiam*). Mrs. Fata sat in a waiting area of the field office for a few minutes. She does not assert that agents interrogated her at this time. Mrs. Fata then requested to use the restroom. The ladies' restroom was locked, therefore ATF agents escorted her to the restroom to open the door. A female agent waited outside the door, and then escorted Mrs. Fata back to the waiting room where agents were waiting. Mrs. Fata was never placed in handcuffs, and testified that she was not physically handled by the agents.

After about fifteen minutes in the waiting room, Mrs. Fata was taken to a large conference room where the questioning took place. Agent Olson testified that the conference room is not a formal interrogation room. It is a large room with a television and a large conference table with approximately 20 chairs surrounding it. Mrs. Fata was placed in this room after she was told she was not in custody and despite actual interrogation rooms being available for use. Because the room is primarily used for agent briefings, it did not have audio or video recording capability. Thus, none of the events that took place inside the room were recorded. The conference room has two entrances, one that goes into the main hallway and the other that leads into ATF office space. The interview lasted for approximately thirty (30) minutes and, after it was completed, Mrs. Fata remained, unsecured, in the conference room. It is unclear whether the doors to the conference room were closed but, even if they were, there is no evidence suggesting Mrs. Fata could not leave at anytime. There were two agents present for the interview, one sitting across from her and the other sitting beside her. During the interview, Mrs. Fata testified that other individuals entered and exited the room. Based on these circumstances, the Court finds that the physical surroundings of the interview were not indicative of "custodial interrogation."

18

### IV.  The duration of the detention

Mrs. Fata waited for approximately fifteen minutes prior to the questioning.  Agent Olson testified that the questioning in the conference room lasted about thirty-minutes.  Mrs. Fata was then taken to her husband's interrogation room, and waited with him.  In total, Mrs. Fata remained at the ATF office around four hours.  Her interview lasted for approximately thirty minutes.  The Ninth Circuit has found a defendant not in custody when he was interrogated for "more than one hour," *Crawford*, 372 F.3d at 1052 (9th Cir. 2004), but has also found that a defendant was in custody when questioning lasted between forty-five and ninety minutes.  *See Kim*, 292 F.3d at 972.  Here, Mrs. Fata's questioning lasted approximately thirty-minutes.  The short length of the actual interview supports the conclusion that Mrs. Fata was not in custody while at the ATF field office.

### V.  The degree of pressure applied to detain Defendant

Agent Olson expressly informed Mrs. Fata that she was not in custody prior to the interview.  This fact weighs heavily in favor of non-custodial interrogation.  *See Crawford*, 372 F.3d at 1060.  Mrs. Fata was never physically restrained.  She was escorted to the restroom, but only because the restroom had was locked and required a key.  No agent remained in the bathroom with her.  During the course of the interview, ATF agents told Mrs. Fata that she should be cooperative and that her bank records could be subpoenaed.  However, this type of comment is not considered by the court to be a high degree of pressure.  *See supra*.  Further, there is no evidence that the agents pressured Mrs. Fata during questioning.  To the contrary, in the recorded video of Mr. Fata's interview, Mrs. Fata appeared at ease following her interview.  As Mrs. Fata left the ATF office, a female ATF employee did walk Mrs. Fata to her car.  This was done to obtain a gun registration and as a matter of courtesy because it was dark outside.  There is no evidence supporting the conclusion that ATF agents applied pressure to such a degree as to turn the interview into a custodial interrogation.

### VI.  Other factors related to restraint

Mrs. Fata also argues that she was unable to leave the Field Office because ATF agents had previously taken her identification card, proof of insurance, and cell phone and did not return the items to

her until after the interrogation.  She also argues that ATF agents took her keys upon arrival at the field office, thereby prohibiting her from leaving.

Mrs. Fata testified that the only reason she followed her husband to the ATF Field Office was due to his visual impairment.  It was not to retrieve her identification card, proof of insurance, or cell phone which were allegedly in possession of the ATF personnel.  The Government correctly notes that Mrs. Fata was able to retrieve these items when she requested them.  Mrs. Fata testified was able to use her cell phone to talk to her daughter prior to the home search but, after speaking with her daughter, agents again took her phone from her.  The video evidence shows that Mrs. Fata asked for her identification and proof of insurance and an agent states that he will get those for her.  In the video Mrs. Fata holds a cell phone and places it on the table after she, presumably, is unable to reach her daughter.  When the cell phone rings, Mrs. Fata answers it without intrusion from agents and, at that point, the video ends.  Thus, Mrs. Fata's testimony is the only evidence that the Court has before it indicating that the cell phone was in ATF control after she made this call.

The Court has little difficulty finding that Mrs. Fata lacks credibility on this issue.  As previously noted, Mrs. Fata seriously undermined her own credibility when, in preparation for the evidentiary hearing, she signed an affidavit indicating that she had not consented to the search of her home.  That sworn testimony was later recanted when she learned that the consent had been recorded.  Indeed, her entire argument regarding consent to search her home was undermined and, consequently, she orally withdrew that aspect of her motion.  The video evidence shows that Mrs. Fata received her identification card and proof of insurance immediately when asked and that she was able to use her cell phone to talk to her daughter prior to the search of Defendants' home.  The video shows Mrs. Fata holding a cell phone and placing it on the table after placing a call.  At one point, her cell phone rings and she answers it without intrusion from agents.  Coupling the misrepresentations in her written affidavit with the video evidence, the Court finds that Mrs. Fata's testimony that ATF agents seized her cell phone is not credible.

Whether ATF agents took Mrs. Fata's car keys is again an issue of credibility.  Mrs. Fata testified that her keys were taken from her when she arrived at the field office.  Mrs. Fata was not able to recall who

took the keys but testified that she thought ATF agent Olson took the keys. Olson testified that he did not seize Defendant's keys nor did he know who might have. Mrs. Fata's counsel asserts that video evidence shows an unknown agent approach her and ask, "[Did] you get your keys back?" However, evidence regarding this alleged comment was not presented during the hearing. Thus, relying on the evidence before it, the Court finds that Mrs. Fata's vagueness and lack of memory surrounding the event, combined with her previous misrepresentations to the Court, are sufficient to find that her testimony lacks credibility.

Ultimately, there is no evidence that Mrs. Fata exhibited any behavior to suggest that she no longer wanted to speak with agents or remain at the ATF Field Office. Mrs. Fata voluntarily appeared at the ATF office. In considering the totality of circumstances surrounding her questioning, the Court finds that Mrs. Fata was not in custody while at the ATF office and, therefore, the *Miranda* warnings were not required prior to her interview.

### D.   The Statements made by Defendant Antoun Fata at the ATF Field Office.

Citing *Missouri v. Seibert*, 542 U.S. 600 (2004), Defendant Antoun Fata argues that his statements at the ATF Field Office must be excluded because law enforcement previously obtained a non-*Mirandized* statement during his roadside detention. Application of *Seibert* is conditioned upon the failure of law enforcement to advise a defendant of his *Miranda* rights in the first instance. Because the Court has found that Mr. Fata was not "in custody" during the roadside detention, there was no failure to administer *Miranda* rights at that time. As such, *Siebert* is inapplicable. Mr. Fata does not argue that the *Miranda* warnings at the ATF Field Office were defective. Consequently, the Court finds that there is no basis to suppress the statements made by Mr. Fata at the ATF Field Office.

### E.  Consent to Search Defendants' Home

While at the ATF office, Mrs. Fata consented to the search of Defendants' home. Mrs. Fata originally moved to suppress the evidence seized from her home but withdrew her motion at the hearing on November 4, 2011. The withdrawal was due to the "new evidence" revealing that the consent was voluntary. She subsequently renewed her motion solely in light of *United States v. Jones*, 132 S. Ct. 945 (2012). As discussed herein, despite the illegal attachment of the GPS device, exclusion of evidence is not appropriate

because law enforcement, when placing the GPS device, objectively relied on then binding judicial precedent.  *See Davis v. United States*, 131 S. Ct. 2419, 2429 (2011).

Defendant Antoun Fata likewise moves to suppress evidence seized from Defendants' home.  A consensual search is reasonable when the consent-giver has authority over the area searched. *United States v. Matlock*, 415 U.S. 164 (1974).   A third-party has actual authority to consent to a search when there is "mutual use of the property by persons generally having joint access or control for most purposes . . . . " *Id.* at 171 n.7; *See also United States v. Dearing*, 9 F.3d 1428, 1429 (9th Cir. 1993) (same).   Mr. Fata and Mrs. Fata are married.  Mr. Fata has not presented any evidence that Mrs. Fata, his spouse of 31 years who lives in the home with him, does not have use of the property, joint access, and control for most purposes.  To the extent Mr. Fata seeks to rely on the Supreme Court decision in *Jones*, the reliance is misplaced based upon the rationale in *Davis* that has already been set forth.

Based on the foregoing and good cause appearing therefore,

**IT IS HEREBY ORDERED** that Defendant Adma Fata's Motion for Joinder to Antoun Jean Fata's Supplemental Motion to Suppress Evidence (#56) is **granted**.

## RECOMMENDATION

**IT IS THE RECOMMENDATION** of the undersigned Magistrate Judge that the Defendant's Motion to Suppress (# 39 ) be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant Antoun Fata's Motion to Suppress (# 41) be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant Antoun Fata Supplemental Motion to Suppress (# 55) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2 any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within

the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

**DATED** this 15th day of March, 2012.

_____
**C. W. HOFFMAN, JR.**
**United States Magistrate Judge**